A. LYSA SIMON, SBN 94884
LAW OFFICES OF A. LYSA SIMON
9846 White Oak Avenue
Suite 205
Northridge, CA 91325
(818) 701-5200

Attorney for Plaintiff
FARMERS INSURANCE GROUP
FEDERAL CREDIT UNION

UNITED STATES BANKRUPTCY COURT

SOUTHERN DISTRICT OF CALIFORNIA, SAN DIEGO DIVISION

| | |
|---|---|
| In re<br><br>RUBEN ALCARAZ JR.<br>aka RUBEN ALCARAZ<br><br>SSN/ID: xxx-xx-4883<br><br>Debtor. | CASE NO. 15-08187-LA7<br><br>CHAPTER 7<br><br>ADV. NO. 16-90111 LA<br><br>DECLARATION OF RAMIL AGUILAR IN SUPPORT OF REQUEST TO ENTER DEFAULT JUDGMENT UNDER 523 |
| FARMERS INSURANCE GROUP CREDIT UNION<br><br>Plaintiff,<br><br>vs.<br><br>RUBEN ALCARAZ JR.<br>aka RUBEN ALCARAZ<br><br>Defendant. | **Hearing Scheduled For:**<br>Date: June 8, 2017<br>Time: 11:00 a.m.<br>Courtroom: Department 3 (Rm 129) |

I, RAMIL AGUILAR, do declare and say:

///

///

///

///

## I. FOUNDATIONAL INFORMATION

1. I am the Collections Supervisor for Plaintiff, Farmers Insurance Group Federal Credit Union (hereafter referred to as the "Credit Union"), and am one of the custodians of records for said Credit Union.

2. The Credit Union, in the normal and usual course of business, keeps and maintains written records of transactions at or near their time of occurrence.

3. I personally supervise and oversee the maintaining and keeping of records by the Credit Union.

4. The Credit Union is a not-for-profit cooperative corporation, duly organized and existing under and by virtue of the laws of the United States of America.

5. The Credit Union is a federally chartered credit union. It is authorized to do business in all of the states of the Union as a credit union. The Credit Union has its principal place of business in the County of Los Angeles, State of California.

6. I am personally familiar with the Credit Union's records on the Defendant, Ruben Alcaraz Jr. aka Ruben L. Alcaraz (hereafter referred to as "Defendant, R. Alcaraz" and/or "Defendant," AND his ex-wife, Patricia Jean Alcaraz aka Patricia J. Alcaraz aka Patricia Alcaraz aka Patti Jean Alcaraz aka Patti J. Alcaraz aka Patti Alcaraz aka Patricia Jean Dykstra aka Patricia J. Dykstra aka Patricia Dykstra aka Patti Jean Dykstra aka Patti J. Dykstra aka Patti Dykstra (hereafter referred to as "P. Alcaraz"). P. Alcaraz is not a debtor in the underlying bankruptcy, nor is she a party to this action.

7. The Credit Union in the normal and usual course of business, keeps and maintains written records of transactions at or near their time of occurrence.

8. All documents attached hereto as exhibits, are true and correct copies of the documents they represent.

9. The Credit Union maintains information and copies of documents on a write once, read many (times) computer system.

10. I first began to work for Farmers Insurance Group Federal Credit Union in 1996. I have been the Collections Supervisor for the Credit Union since 2003.

## II. STATE COURT JUDGMENT

11. The Defendant is indebted to the Credit Union on a Judgment entered in the Superior Court of the State of California, County of San Diego, Case Number 37-2014-00083496-CU-CL-NC. The Judgment was entered in favor of the Credit Union on November 9, 2015, in the sum of **$74,520.61**. (Said lawsuit shall hereafter be referred to as the "State Court Action.") A copy of the Judgment entered in the State Court Action is annexed to the Exhibit Index, concurrently filed herein marked as Exhibit "1" and is incorporated herein by this reference. It was marked as Exhibit "91" to the 2004 Examination of the Defendant taken on April 25, 2016, by the Credit Union's attorney.

12. The State Court Judgment is based upon written loan agreements, which provided for recovery of attorneys' fees and costs. The Judgment award included a provision for attorneys' fees.

13. The Judgment was based upon the following **four (4)** subaccounts loans:

**a.** **Sub-account xxx30-L40.2** (granted **on September 20, 2012,** Vehicle Secured Loan**).**

**b.** **Sub-account xxx30-L75** (granted **on June 6, 2013,** VISA**).**

**c.** **Sub-account xxx30-L82** (granted **on January 13, 2014,** Home Equity Line of Credit referred to as a "HELOC"**).**

**d.** **Sub-account XXX30-L1** (granted **on January 6, 2014,** signature loan**).**

14. The L40.2 was secured by the Defendant's and his ex-wife, P. Alcaraz' 2007 Jeep Commander, Vehicle Identification Number 1J8HH48N07C574456, License Number 5YKA031. Said vehicle shall hereafter be referred to as the "vehicle." The Credit Union was able to recover possession of said vehicle after the automatic stay terminated. The Credit Union recently liquidated it. The net proceeds will be credited against the amounts owed by the Defendant, when the Credit Union files a Memorandum of Costs, in the State Court Action, after judgment for non-dischargability is entered herein. Credit will be given in the manner required by California Commercial Code sections 9615 and 9616.

///

15. The written loan agreements provide that Credit Union is entitled to recover attorneys' fees. Due to the fraudulent actions of the Defendant herein, the Credit Union has had to incur attorneys' fees in enforcing its rights under the Judgment based upon said written agreements. The Credit Union is therefore entitled to recover reasonable attorneys' fees, as well as the costs incurred herein.

## III. CREDIT UNION'S FIELD OF MEMBERSHIP AND AGENCY SECURED LOANS

16. The Credit Union is wholly owned by its members. Its membership primarily consists of the agents, district managers, employees (and their family members) of FARMERS INSURANCE EXCHANGE, a reciprocal or interinsurance exchange; TRUCK INSURANCE EXCHANGE, a reciprocal or interinsurance exchange; FIRE INSURANCE EXCHANGE, a reciprocal or interinsurance exchange; MID-CENTURY INSURANCE COMPANY, a California stock corporation; and FARMERS NEW WORLD LIFE INSURANCE COMPANY, a Washington stock company. Said companies frequently use the trademark name "FARMERS INSURANCE GROUP OF COMPANIES." They shall hereafter be collectively referred to as the "Insurance Companies."

17. **The Credit Union is NOT part of the Insurance Companies. It is NOT owned by the Insurance Companies, nor is it an affiliate of the Insurance Companies. It is owned by the agents, district managers, employees (and their family members) of the Insurance Companies, and a few other small employee business groups (and their family members). They are its members.** The Credit Union exists for the purpose of providing financial services to its members.

18. The Credit Union's field of membership is limited to the Insurance Companies' agents, district managers, their employees, and the family members of each, as well as a few other small employee groups and organizations. The Credit Union derives its name from its primary field of membership.

19. The Defendant entered into an Appointment Agreement, with the Insurance Companies, in 2006. An Appointment Agreement is a contract between an insurance agent and the Insurance Companies. It has a residual cash value. The value of an Appointment Agreement's residual cash value is based upon the types of insurance policies and their value, presented by an insurance agent to the Insurance Companies.

20. The Credit Union knows from dealing with its field of membership, that insurance agents, such as the Defendant, when acting as an insurance agent under their Appointment Agreement's with the Insurance Companies, are independent contractors, i.e., self employed individuals.

21. The Credit Union makes loans to members secured by the cash value (i.e., residual value) of Insurance Agents' Appointment Agreements with the Insurance Companies. The Credit Union also makes other types of loans to the Credit Union's members, such as signature loans, vehicle secured loans, home equity lines of credit, credit card accounts. The least risky type of loan the Credit Union makes is an Agency Secured loan secured by the residual value and commissions, of a Farmers' agent's Appointment Agreement.

22. The Declaration of A. Lysa Simon discusses at P9:22 through P37:18 the pertinent information about the amount of taxes the Defendant owed and when he knew he owed said taxes. As detailed in Ms. Simon's declaration, the Defendant knew how much he owed in past due taxes in March of 2012 (See the Declaration of A. Lysa Simon pages 14:28 through 16:26 and page 34:12-17, see Exhibits "37" and "38"). The Declaration of A. Lysa Simon establishes that the Defendant produced a number of letters, which the Defendant received from the Internal Revenue Service that acknowledged the Defendant was making payments on his past due taxes. Ms. Simon's Declaration also references the Defendant's testimony, in which he admitted that he had not paid any estimated taxes since 2008. Said Declaration establishes that the Defendant knew he owed tens of thousands of dollars, in past due federal income taxes.

///

## IV. FABRICATED DOCUMENTS PRODUCED BY THE DEFENDANT AT HIS 2004 EXAMINATION

23. The Defendant produced a number of documents during his 2004 Examination. Many of the documents were the loan documents the Defendant had provided to the Credit Union, after he had reviewed and signed them. One of the documents was completely fabricated and never given to the Credit Union. Another document was an altered version of what the Defendant had given to the Credit Union.

24. The fabricated document was a Personal Financial Statement, dated and purportedly signed December 11, 2012. Said document is annexed to the Exhibit Index, marked as Exhibit "2" and is incorporated herein by this reference. Other Credit Union staff and I have searched through all the records and documents we have on the Defendant. Said document was Exhibit "95" of the Defendant's 2004 Examination. Said document was never given to the Credit Union and was not in any of our records on the Defendant. We granted the Defendant a loan on December 13, 2012, but he was not asked to provide a Personal Financial Statement with said loan and he did not do so. Had he provided it we would have asked why he still had taxes for 2011. By that time the taxes would have been past due. However, again, he never provided that document to the Credit Union. Further, worth noting, as detailed below, the Defendant misrepresented his income on his fabricated December 11, 2012 Personal Financial Statement. Said fact is detailed further below.

25. The second document that needs to be addressed was also a Personal Financial Statement. It was signed and dated January 2, 2014. Said document is annexed to the Exhibit Index, marked as Exhibit "3" and is incorporated herein by this reference. The copy produced to the Credit Union's attorney for the Defendant's 2004 Examination was altered. It was Exhibit "106" of the Defendant's 2004 Examination.

///

///

///

26. The actual January 2, 2014 Personal Financial Statement signed and provided to the Credit Union by the Defendant in January of 2014, is annexed to the Exhibit Index, marked as Exhibit "4" and is incorporated herein by this reference. It was Exhibit "120" of the Defendant's 2004 Examination.

27. The Defendant altered the January 2, 2014 Personal Financial Statement given to the Credit Union, by handwriting on the copy provided to the Credit Union's attorney for his 2004 Examination the words: "I pay monthly to the IRS. Have no tax liens." The fact that the Defendant altered the January 2, 2014 Personal Financial Statement, which he gave to the Credit Union's attorney for the 2004 Examination, shows he knew his failure to disclosure his back unpaid taxes was a material misrepresentation that would have caused the Credit Union to deny him credit.

28. As detailed in the Declaration of A. Lysa Simon, she typed on the bottom of the documents from the Credit Union's records "CU Doc" and then the account and suffix number on the lower left corner of the documents used as exhibits during the Defendant's 2004 Examination. On the documents produced by the Defendant, she wrote a "△P" (i.e., a delta symbol and P for Debtor produced).

## V. SUMMARY OF THE DEFENDANT'S LOANS WITH THE CREDIT UNION

29. Below is a list of the Defendant's loans with the Credit Union between March 23, 2012 and January 2014. Had the Defendant not misrepresented his financial condition as early as March 23, 2012, he would not have qualified for any type of loan with the Credit Union, with the possibility exception of an Agency Secured Loan, secured by the contract value of his Appointment Agreement with the Insurance Companies.

30. The loans the Defendant obtained from the Credit Union between March 2012 and January 13, 2014 are listed below. Some of said loans have been either refinanced and/or paid off.

///

///

///

| Date of Appl. | Acct #[1] | Sub Acc | Amnt $ Brrwd | Type | Notes |
|---|---|---|---|---|---|
| 3/23/2012 | 29 | L-2.1 | $52,743.93 | Agency secured | Agency secured loan refinanced |
| 12/13/2012 | 29 | L-2.2 | $84,847.00 | Agency secured | Agency secured loan |
| 3/11/2013 | 29 | L-2.3 | $12,000.00 | Agency secured | Agency secured loan |
| 6/6/2013 | 29 | L1 | $10,000.00 | Signature loan | |
| | 29 | L-75 | $5,000.00 | VISA | Used 29 sub acct. L1 application |
| 7/26/2011 | 30 | L40 | $24,578.80 | Auto | 2006 Ford F250 |
| 5/17/2012 | 30 | L40.1 | $12,000.00 | Auto | 2005 Lincoln Aviator |
| 9/20/2012 | 30 | L40.2 | $14,113.00 | Auto | Jeep Commander |
| 1/6/2014 | 30 | L1 | $40,000.00 | Signature Loan | |
| 1/13/2014 | 30 | L82 | $15,000.00 | HELOC | HELOC |

31. Worth noting is that when a Credit Union member applies for a loan, the member can apply for the loan on-line, by filling in information on an application electronically; on a secure site and emailing it to the Credit Union; or by completing an application by hand; computer; or typewriter. All of the information on the applications presented to the Credit Union by the Defendant, was provided to the Credit Union by the Defendant.

## VI. DEFENDANT'S MARCH 9, 2012 L-2.1 AGENCY SECURED LOAN

32. On or about March 9, 2012, the Defendant applied for a L-2.1 Agency Secured Loan, under his membership account originally ending **xx29**.

33. As part of the application process on the L2.1 Agency Secured Loan, the Defendant submitted a written Personal Financial Statement. The Defendant's Personal Financial Statement was an assert/liability balance sheet, on which the Defendant indicated in writing that he owed only the sum of **$20,419.00 in unpaid taxes for <u>tax year</u> <u>2011</u>.** A copy of the signed Personal Financial Statement, which the Defendant gave to

---

[1] The Acct number refers to the last two (2) digits of the Defendant's account number with the Credit Union. He had two (2) account numbers with the Credit Union. The L number is a subaccount number.

the Credit Union, on or about **March 9, 2012,** is annexed to the Exhibit Index, marked as Exhibit "5" and is incorporated herein by this reference. It was Exhibit "146" of the 2004 Examination. On the bottom of the second page, in section 6. under the request for information, which stated: "Unpaid Taxes Described in detail giving type, to whom payable, when due, amount and if there were any tax liens recorded," the following was indicated:

"Federal Taxes for 2011 - $18,470.00 / State Taxes for 2011 - $1,949.00."

The typed information on the Personal Financial Statement was provided to the Credit Union by the Defendant.

34. It is worth noting as of **March 9, 2012**, the Defendant's **personal income taxes for tax year 2011** were not yet past due. The Defendant had until **April 15, 2012** to pay them.

35. The Defendant also indicated on his Personal Financial Statement that his income was $11,500.00 per month, from his salary or commission and $3,000.00 per month from other income.

36. The information on the Defendant's Personal Financial Statement, submitted in support of his request for his L-2.1 Agency Secured Loan, under his membership account originally ending **xx29,** was false.

37. The true facts as we now know them are as follows:

a. In actuality, prior to January 2012, the Defendant knew that he had past due federal income taxes for **tax years 2009 and 2010 in the total sum** of **$22,928.56.** This was in addition to what the Defendant owed but had not paid for the tax year 2011. We know this from the Defendant's 2004 Examination testimony and from the letters he produced for his 2004 Examination, including a letter to the Defendant from the Internal Revenue Service, dated January 4, 2012, which at the top says "Notice CP521" (see Declaration of A. Lysa Simon page 12:1-3 and pages 14:28 through 15:17). A copy of the Internal Revenue Service, Notice CP521, dated January 4, 2012, is annexed to the Exhibit Index, marked as Exhibit "6," and is

incorporated herein by this reference. It was Exhibit "22" of the 2004 Examination. According to the Internal Revenue Service, Notice CP521, dated January 4, 2012, the Defendant was making payments on his past due taxes for the tax years 2009 and 2010, and therefore knew how much he owed and for which tax years.

b. According to the Defendant's 2012 1040 Income Tax Return, his income was only the sum of $90,742.00 for the year, i.e., the average sum of $7,561.83 per month. The Defendant's tax returns and 1099 forms were produced by the Defendant during his 2004 Examination. The Defendant's 2012 1040 Income Tax Return is annexed to the Exhibit Index, marked as Exhibit "7" and is incorporated herein by this reference. It was Exhibit "122" of the 2004 Examination.

c. According to the Defendant's 2011 federal Income Tax Return 1040, his total income for all of tax year 2011, was at most only the sum of $94,832.00. This means that the Defendant's average income was only the sum of $7,902.66 per month in 2011. The Defendant's 2011 federal Income Tax Return 1040 that he gave the Credit Union's attorney at his 2004 Examination is annexed to the Exhibit Index, marked as Exhibit "8" and is incorporated herein by this reference. It was Exhibit "9" of the 2004 Examination. It indicates that he owed $18,764.00 for federal income taxes for 2011.

d. According to the Defendant's 2012 1099 forms, he was not earning $3,000.00 per month, from another source, in 2012. In fact, the Defendant's total income from all other sources in 2012, was only the sum of $2,483.12 for the entire year. The Defendant's 2012 1099 forms, which he produced for his 2004 Examination are annexed to the Exhibit Index, marked as Exhibit "9" and is incorporated herein by this reference. They were Exhibit "13" of the 2004 Examination.

e. According to the Defendant's 2011 1099 forms, he was not earning $3,000.00 per month, from another source as he had claimed on his L-2.2 application. In fact, the Defendant's total income from all other sources in 2011, was only the sum of $2,900.55 for the entire year. The Defendant's 2011 1099 forms were provided during his 2004 Examination. A copy of the Defendant's 2011 1099 forms are annexed to the Exhibit Index, marked as Exhibit "10" and is incorporated herein by this reference. They were Exhibit "11" of the 2004 Examination.

38. The misrepresentation of the Defendant's financial condition by the Defendant on his written Personal Financial Statement, which he gave to the Credit Union was material. Had the Credit Union known the actual amount Defendant owed in taxes, the Credit Union would not have granted the Defendant's application for a Agency Secured Loan in March of 2012 or any other loan request. The Defendant was a disaster waiting to happen.

39. We now know from the documents the Defendant produced at his 2004 examination, the Defendant **owed for federal and state taxes more than $22,648.62, in past due taxes, as of March 9, 2012,** and **owed another $18,764.00 for 2011's federal income tax[2], and the sum of $2,129.00 for 2011's state income tax[3]**, the Credit Union would not have granted the Defendant's application for a Agency Secured Loan in March of 2012 or any other loan request. A copy of the Defendant's 2011 540 California tax return is annexed to the Exhibit Index, marked as Exhibit "11" and is incorporated herein by this reference. It was Exhibit "8" of the 2004 Examination. **The actual total amount in taxes which the Defendant owed as of March of 2012 was the sum of $43,541.62.**

---

[2] (The sum of $18,764.00 was indicated as the amount due on the Defendant's 2011's 1040 federal tax return (Exhibit "8").

[3](The sum of $2,129.00, was indicated as the amount due on the Defendant's 2011's 540 California Franchise Tax return (Exhibit "11").

**40. The Defendant also knew he had not been paying any estimated taxes since 2008. This means he knew that even as he was making monthly payments on his 2009, 2010, and later his 2011 taxes, he was not paying his current taxes. This means the Defendant knew he was incurring more and more debt for past due taxes. The Defendant by providing the Credit Union with false information in writing, was hiding said fact from the Credit Union.**

41. There was no way for the Credit Union to have known that Defendant was not paying his estimated taxes or that he owed so much for past due taxes, etc. The Credit Union reasonably relied upon the written information that the Defendant provided to the Credit Union. On the other hand, the Defendant knew that the information he was providing to the Credit Union was false.

42. Had the Defendant not misrepresented and hid from the Credit Union his true financial condition, he would not have been given any loans by the Credit Union, including the four (4) loans that were reduced to judgment in the State Court Action.

43. There is another point which needs to be addressed and that is when the Defendant applied for his L2.1 loan he submitted a copy of his 2011 tax return. It is annexed to the Exhibit Index marked as Exhibit "60" and is incorporated herein. The version given to the Credit Union was marked as Exhibit "145," to the 2004 Examination. It was dated and signed by the Defendant and his now exwife. However, the amounts of income are slightly less, i.e., $92,537.00 for 2011 and the amount owed for his taxes are in the sum of $18,470.00. It is the same amount that the Defendant admitted he owed on this March 9, 2012 Personal Financial Statement. The tax return given to the Credit Union in March of 2012, is different from the tax return provided to the Credit Union's attorney and about which he testified was a true and correct copy of the 2011 1040 Tax Return that he filed with the Internal Revenue Service. One of the two (2) returns, if not both, was therefore altered.

///

///

## VII. DEFENDANT'S SEPTEMBER 20, 2012 L40.2 VEHICLE SECURED LOAN

44. The Defendant applied for a vehicle secured loan (L40.2) using a written loan application, dated **September 20, 2012.** A copy of the Defendant's **September 20, 2012** loan application on his L40.2 is annexed to the Exhibit Index, marked as Exhibit "12" and is incorporated herein by this reference. It was Exhibit "125" of the 2004 Examination.

45. The Defendant signed the written loan agreement on the vehicle secured loan (L40.2) on or about **September 20, 2012.** A copy of the Defendant's **L40.2 written loan agreement is** annexed to the Exhibit Index, marked as Exhibit "13" and is incorporated herein by this reference. It was Exhibit "127" of the 2004 Examination.

46. On the September 20, 2012 loan application, the Defendant falsely represented to the Credit Union that his income was the sum of $6,371.00 per month, from his insurance business. He also claimed that he had additional MONTHLY income from another source 2010/2011 CFA in the sum of $242.00.

47. The Defendant knew that his actual income from a profit and loss statement, dated **August 15, 2012,** which he obtained from his accountant, was actually on average, only the sum of $6,074.60 per month. ($45,559.53 / 7.5 = $6,074.60). A copy of the Alcaraz Insurance Agency Profit and Loss January 1, through August 15, 2012, which the Defendant produced for his 2004 Examination, is attached hereto, marked as Exhibit "14," and is incorporated herein by this reference. It was Exhibit "45" to the 2004 Examination.

48. In addition, as noted above, the Defendant in March of 2012 had hidden from the Credit Union that he had more than $40,000.00 in federal and state taxes.

49. We now know that by September 4, 2012, the Defendant owed the Internal Revenue the sum of $40,339.23, for past due taxes for tax years 2009, 2010 and 2011. We know this from the CP521 letter, dated September 5, 2012, the Internal Revenue Service sent the Defendant. On said letter the Defendant wrote on a "PAID" stamp "9/4/12, ✓ 5262." A copy of the CP521 letter, dated September 5, 2012 the Internal Revenue Service is annexed to the Exhibit Index, marked as Exhibit "15" and is

///

incorporated herein by this reference. It was produced by the Defendant for his 2004 Examination. It was Exhibit "34" in the 2004 Examination.

50. Had the Credit Union known the Defendant had more than $40,000.00, in past due federal and state taxes and/or the Defendant was overstating his income, the Credit Union would have denied the Defendant's request for an extension of Credit in September of 2012.

51. Had the Credit Union known the Defendant's true financial condition, the Defendant would not have qualified for a vehicle secured loan or any loan, from the Credit Union.

52. The L-40.2 loan was not paid off. It was part of the Judgment that the Credit Union obtained against the Defendant.

53. Again, the Defendant **never** submitted to the Credit Union the Personal Financial Statement, dated December 11, 2012, which he provided to the Credit Union's attorney for his 2004 Examination (Exhibit "2").

## IX. DEFENDANT'S DECEMBER 13, 2012 L2.2 AGENCY SECURED LOAN

54. The Defendant applied for another Agency secured loan (L2.2) using a written loan application on or about **December 13, 2012.** A copy of the Defendant's **December 13, 2012** loan application on his L2.2 subaccount, is annexed to the Exhibit Index, marked as Exhibit "16" and is incorporated herein by this reference. It was Exhibit "139" of the 2004 Examination.

55. On the December 13, 2012 L2.2 loan application, the Defendant falsely represented to the Credit Union that his income was the sum of $7,636.00 per month, from his insurance business. He also falsely claimed that he had additional MONTHLY income from another source 2010/2011 CFA in the sum of $6,962.00. The total amount of monthly income claimed by the Defendant was the sum of **$14,598.00 per month.**

56. According to the Defendant's income tax return for 2012, his income was only the sum of $90,742.00 for the year, i.e., the average sum of $7,561.83 per month (Exhibit "7").

57. In addition, the Defendant as noted above, in March of 2012 had hidden from the Credit Union that he had more than $40,000.00 in past due federal and state taxes. Had the Defendant not hid said fact, he would not have qualified for any extensions of credit from the Credit Union, without at least proving that he had resolved his tax problem.

58. Had the Credit Union known the Defendant had more than $40,000.00 in past due federal and state taxes in December 2012, and/or he was overstating his income, the Credit Union would have denied the Defendant's request for an extension of Credit in December of 2012.

59. Had the Credit Union known the Defendant's true financial condition, the Defendant would not have qualified for a any credit from the Credit Union.

**VIII. DEFENDANT'S MARCH 11, 2013 L2.3 AGENCY SECURED LOAN**

60. The Defendant applied for another Agency secured loan (L2.3) using a written loan application, dated **March 11, 2013.** A copy of the Defendant's **March 11, 2013** loan application on his L2.3 is annexed to the Exhibit Index, marked as Exhibit "17" and is incorporated herein by this reference. It was Exhibit "129" of the 2004 Examination.

61. On the **March 11, 2013** loan application the Defendant falsely represented to the Credit Union that his income was the sum of $7,428.00 per month, from his insurance business. He also falsely claimed that he had additional MONTHLY income from another source 2010/2011 CFA in the sum of $8,962.00. The total amount of monthly income claimed by the Defendant was the sum of **$16,390.00** per month.

62. Worth noting, is that the Declaration of A. Lysa Simon indicates that the Defendant testified under oath, during his 2004 Examination that he only had to walk next door (to his work) to obtain an income from a profit and loss statement from his accountant and that she would not charge him for it (See the Declaration of A. Lysa Simon page 42:3-23).

63. According to the Defendant's 2012 1040 Income Tax Return, the Defendant's income was only the sum of $90,742.00 for the year, i.e., the average sum of $7,561.83 per month (Exhibit "7").

64. According to the Defendant's 2013 1040 Income Tax Return, his income was only the sum of $72,107.00 for the year, i.e., the average sum of $6,008.92 per month. A copy of the Defendant's 2013 1040 Income Tax Return is annexed to the Exhibit Index, marked as Exhibit "18" and is incorporated herein by this reference. It was Exhibit "15" of the 2004 Examination.

65. In addition, the Defendant as noted above, in March of 2012 had hidden from the Credit Union that he had more than $40,000.00, in past due federal and state taxes. Had the Defendant not hid said fact, he would not have qualified for any extensions of credit from the Credit Union.

66. According to the Letter sent to the Defendant by the Internal Revnue Service, form CP521, dated **January 2, 2013,** produced by the Defendant during his 2004 Examination, by **January of 2013,** he owed back taxes for tax years **2009, 2010, and 2011** a total of **$37,894.08.** In addition, the Defendant would owe money for his **2012 federal income taxes** according to his 2012 1040 Income Tax Return the sum of **$17,997.00**. His total taxes by March of 2013, were therefore in excess of the sum of **$55,891.08.** A copy of the Internal Revenue Service, form CP521, dated January 2, 2013, to the Defendant, which he produced at his 2004 Examination is annexed to the Exhibit Index, marked as Exhibit "19" and is incorporated herein by this reference. It was Exhibit "37" of the 2004 Examination.

67. Had the Credit Union known the Defendant had more than **$55,891.08,** in unpaid federal and state taxes and/or the Defendant was overstating his income, the Credit Union would have denied the Defendant's request for an extension of credit in March of 2013.

68. Had the Defendant not misrepresented his financial condition on his March 9, 2012 Personal Financial Statement the Credit Union would have known to ask more questions about the Defendant's taxes and would not have granted him any credit unless he had provided proof that he had resolved his tax problem. Instead, his tax problem continued to grow and the Defendant continued to trick and defraud the Credit Union.

69. Had the Credit Union known the Defendant's true financial condition, the Defendant would not have qualified for any credit from the Credit Union.

**X. DEFENDANT'S JUNE 6, 2013 L1 SIGNATURE LOAN AND VISA CREDIT CARD APPLICATION**

70. The Defendant applied for Signature loan (L1) and a VISA credit card (L75) using a written credit application, on or about **June 6, 2013**.

71. A copy of the Defendant's **June 6, 2013** loan application for his Signature loan (L1) and a VISA credit card (L75), is annexed to the Exhibit Index, marked as Exhibit "20" and is incorporated herein by this reference. It was Exhibit "136" of the 2004 Examination.

72. A copy of the signature loan Agreement, (L1) granted on the **June 6, 2013** loan application is annexed to the Exhibit Index, marked as Exhibit "21" and is incorporated herein by this reference. It was Exhibit "137" of the 2004 Examination.

73. A copy of an email to the Defendant from the Credit Union, dated **June 6, 2013**, advising him that his application for a VISA credit card, with a $5,000.00 credit limit had been granted is annexed to the Exhibit Index, marked as Exhibit "22" and is incorporated herein by this reference. It was Exhibit "134" of the 2004 Examination.

74. A copy of the Credit Card Agreement, (L75) granted on the **June 6, 2013** loan application, is annexed to the Exhibit Index, marked as Exhibit "23" and is incorporated herein by this reference. It was Exhibit "135" of the 2004 Examination.

75. On the **June 6, 2013** credit application, the Defendant falsely represented to the Credit Union that his income was the sum of $8,632.00 per month, from his insurance business. He also falsely claimed that he had additional MONTHLY income from another source 2010/2011 CFA in the sum of $6,962.00. The total amount of monthly income claimed by the Defendant was the sum of $15,594.00 per month.

///

///

///

76. According to the Defendant's income tax return for 2012, his income was only the sum of $90,742.00 for the year, i.e., the average sum of $7,561.83 per month (Exhibit "7").

77. According to the Defendant's 2013 1040 Income Tax Return, his income was only the sum of **$72,107.00** for the year, i.e., the average sum of **$6,008.92** per month (Exhibit "18").

78. In addition, the Defendant as noted above, in March of 2012 had hidden from the Credit Union the fact he had more than $40,000.00 in past due federal and state taxes. Had the Defendant not hid said fact, he would not have qualified for any extensions of credit from the Credit Union.

79. Had the Credit Union known that as of June 2013 the Defendant had more than $55,891.00 in past due federal and state taxes, and he was overstating his income, the Credit Union would have denied the Defendant's request for an extension of Credit in June 6, 2013 on both the signature loan and the VISA credit card.

80. The Credit Union was outstanding and part of the Judgment entered against the Defendant.

81. Had the Credit Union known the Defendant's true financial condition, the Defendant would not have qualified for any credit from the Credit Union.

82. The Credit Union reasonably relied upon the information which the Defendant gave to the Credit Union in writing.

**XI. DEFENDANT'S JANUARY 2, 2014 HELOC APPLICATION**

83. The Defendant applied for Home Equity Line of Credit (hereafter referred to as a "HELOC" on a written loan application, dated January 2, 2014. A copy of the January 2, 2014 HELOC L82 application is annexed to the Exhibit Index, marked Exhibit "24" and is incorporated herein by this reference. It was Exhibit "118" of the 2004 Examination.

84. We now know from the documents the Defendant produced for his 2004 Examination that the Defendant's representation regarding his income and employment etc. were false, on his January 2, 2014 L1 application.

85. The Defendant falsely represented on his January 2, 2014 L1 application the following:

a. The Defendant falsely represented that he was a "Agent-Farmers." (He also indicated that he had started as an agent in March of 2006.)

b. It was as a Farmer Insurance Company agent that the Defendant had a source of income.

c. As a "Agent-Farmers" the Defendant claimed his income was the sum of $12,000.00 per month.

d. The Defendant checked "NO" in response to the question: "Do you know of any event that may interrupt your income?"

86. We now know, from the Defendant's testimony during his 2004 Examination the following:

a. The Defendant had orally agreed to sell his Farmers Insurance Appointment Agreement and his Farmers Insurance Agency to another Farmers Insurance Agent, a Mr. Kenneth Daniel Jackson, in September of 2013.

b. The Defendant had an attorney draft an agree to sell his Farmers Insurance Appointment Agreement and his Farmers Insurance Agency to Mr. Jackson in or around November of 2013. Annexed to the Exhibit Index marked as Exhibit "25" and incorporated herein by this reference is a letter to the Defendant's attorney which discussed the terms of the sale. Worth noting is that the Defendant and his attorney, who was present at the 2004 Examination, did not raise the Attorney Client Privilege with regard to said letter. It is Exhibit "71" to the 2004 Examination.

c. By November 20, 2013, the Defendant had received a down payment on the sale of his business to Mr. Jackson. Annexed to the Exhibit Index, marked as Exhibit "26" and incorporated herein by this reference is a November 20, 2012 receipt for a $5,000.00 down payment, on the sale of the Defendant's business. It is Exhibit "79" to the 2004 Examination.

d. On November 18, 2013, the Defendant signed a letter to the insurance companies advising them of the sale of his business to Mr. Jackson. Annexed to the Exhibit Index, marked as Exhibit "27" and incorporated herein by this reference is a copy of the letter from the Defendant to the Insurance Companies. It is Exhibit "75" to the 2004 Examination.

e. By at least December 2013, the Defendant and the purchaser of his business had signed the agreement to sell the Defendant's Insurance Agency to the buyer. The purchaser was paying the Defendant the sum of $100,000.00 for the business. Annexed to the Exhibit Index, marked as Exhibit "28" and incorporated herein by this reference is a copy of the Agreement of Purchase and Sale of Assets, through which the Defendant sold his Appointment Agreement to Mr. Jackson. It is Exhibit "72" to the 2004 Examination.

f. By the end of December 2013, the purchaser, Mr. Jackson had paid the Defendant the sum of $85,000.00. (See Declaration of A. Lysa Simon page 38:15-23 and page 41:12-14.)

g. By December 8, 2013, the Defendant had turned over all of his Insurance Agency to the purchaser, Kenneth Daniel Jackson (hereafter referred to as Mr. Jackson). (See Declaration of A. Lysa Simon pages 38:15-23, 39:14 through 40:3, and 51:16 through 52:16.)

h. After December 8, 2013, the Defendant was not writing any more had turned over all of his Insurance Agency to the purchaser, Mr. Jackson. (See Declaration of A. Lysa Simon pages 50:16 through 51:3.)

i. We now know the Defendant was not earning $9,150.00 per month, as a Farmers Agent in January of 2014, or at all for that matter. He had sold his business in December of 2013.

j. The Defendant knew that his income as a Farmers Agent had ended but failed to disclose said fact to the Credit Union.

(See the Declaration of A. Lysa Simon regarding the Defendant's testimony during his 2004 Examination about selling his business, Pages 37:19 through 42:16)

87. The Defendant knew by January 2014 he was past due taxes for tax years 2010 and 2011 in the total sum of $32,000.21. We now know the Defendant had received a Notice CP521 from the Internal Revenue Service, dated December 4, 2013. (See the Declaration of A. Lysa Simon pages 11:23 through 12:10.) A copy of the Internal Revenue Service, Notice CP521, dated December 4, 2013. is annexed to the Exhibit Index, marked as Exhibit "29," and is incorporated herein by this reference. It was Exhibit "49" of the 2004 Examination.

88. When the Defendant applied for the HELOC, in 2014, in addition to the January 2, 2014 HELOC application, he gave to the Credit Union a Personal Financial Statement, dated January 2, 2014 (Exhibit "3"). This is the second altered/fabricated document discussed at the beginning of this Declaration. On both of the Personal Financial Statements, dated January 2, 2014, given to the Credit Union and later to the Credit Union's attorney, the Defendant falsely indicated that his Appointment Agreement, which is referred to as "Agency Contract Value," was worth the sum of $148,000.00. As can be seen from the evidence above, we now know that the Defendant had sold his Appointment Agreement and agency to Mr. Jackson between September and December 2013.

89. Again, the January 2, 2014 Personal Financial Statement, is the one the Defendant altered when he gave a copy to the Credit Union's attorney. The altered January 2, 2014 Personal Financial Statement, (Exhibit "3"), which the Defendant gave to the Credit Union's attorney has a handwritten notation on it that says "I pay monthly to the IRS. Have no tax liens." This handwritten statement was not on the copy of the January 2, 2014 Personal Financial Statement given to the Credit Union (Exhibit "4").

90. As stated above, the fact the Defendant altered the January 2, 2014 Personal Financial Statement he gave to the Credit Union's attorney for the 2004 Examination, shows he knew his failure to disclosure his back unpaid taxes was a material misrepresentation, which would have caused the Credit Union to deny him credit.

91. Had the Credit Union known that as of January 2014 that the Defendant had more than $40,000.00 in past due federal and state taxes, the Credit Union would have denied the Defendant's request for HELOC.

92. Had the Credit Union known the Defendant had sold his Agency to Mr. Jackson, the Credit Union would have the Credit Union would have denied the Defendant's request for HELOC.

93. A copy of the Note on the HELOC agreement is annexed to the Exhibit Index, marked as Exhibit "30" and is incorporated herein by this reference. It was Exhibit "104" of the 2004 Examination. The real property that secured the HELOC was foreclosed upon by the senior lien holder. The HELOC debt was still outstanding and was part of the Judgment entered against the Defendant.

## XII. DEFENDANT'S JANUARY 6, 2014 SIGNATURE LOAN

94. The Defendant applied for **new** Signature loan (L1) from the Credit Union on a written loan application dated January 6, 2014. A copy of the January 6, 2014 L1 application is annexed to the Exhibit Index, marked Exhibit "31" and is incorporated herein by this reference. It was Exhibit "109" of the 2004 Examination. (The copy was produced by the Defendant. The Credit Union's copy was Exhibit "116" of the 2004 Examination.)

95. On or about January 6, 2014, the Defendant executed and delivered to the Credit Union a written loan agreement, under which he agreed to repay all sums advanced by the Credit Union according to the terms and conditions at the time of the advance. Said agreement shall hereafter be referred to in this cause of action as the "L1 agreement." A copy of the L1 agreement is annexed to the Exhibit Index, marked as Exhibit "32" and is incorporated herein by this reference. It was marked Exhibit "107" in the 2004 Examination.

96. We now know from the documents the Defendant produced at his 2004 Examination that the Defendant's representations regarding his income, employment, etc. on the January 6, 2014 L1 application were false.

///

///

97. The Defendant falsely represented on his January 6, 2014 L1 application the following:

a. The Defendant falsely represented that he was a "Agent-Farmers." (He also indicated that he had started as an agent in March of 2006.)

b. It was as a Farmer Insurance Company agent that the Defendant had a source of income.

c. As a "Agent-Farmers" the Defendant's income was the sum of $9,150.00 per month.

98. We now know, from the Defendant's testimony and the documents he produced for his 2004 Examination that the Defendant had sold and delivered his Farmers Insurance Agency to Mr. Jackson by December 8, 2013.

99. Also as stated above, the Defendant knew by January 2014, that he was past due taxes for tax years 2010 and 2011 for more than $40,000.00.

100. Had the Credit Union known, as of January 2014, the Defendant had more than $40,000.00 in past due federal and state taxes, the Credit Union would have denied the Defendant's request for the new January 2014 Signature Loan L1.

101. Had the Credit Union known the Defendant had sold his Agency to Mr. Jackson, the Credit Union would have the Credit Union would have denied the Defendant's request for the new January 2014 Signature Loan L1.

102. The L1 subaccount was still outstanding and was part of the Judgment entered in the State Court Action.

## XIII. ATTORNEYS' FEES

103. The Judgment entered against the Defendant provided for recovery of attorneys' fees and costs. It was based on the terms of the each of the credit agreements executed by Defendant and delivered to the Credit Union, the Credit Union is entitled to recover reasonable attorneys' fees. As a result, under California law, the Credit Union is entitled to recover its attorneys' fees and costs.

///

## XIV. COSTS

104. The Credit Union has incurred costs in this matter, as follows:

a. Filing fees ........................................ $ 350.00

b. Court reporters' fees ........................................ $1,978.40

Total costs: $2,328.40

## XV. SUMMARY

105. The Credit Union reasonably relied upon the documents and information the Defendant gave to the Credit Union.

106. Credit Union Farmers Insurance Group Federal Credit Union is entitled to the following:

a. A Judgment in the Bankruptcy Court declaring under 11 U.S.C. §523(a)(2)(b) that Judgment against the Defendant, Ruben Alcaraz, declaring that the State Court Judgment entered against him is not dischargeable.

b. Costs in the sum of $2,328.40.

c. The right to add the Credit Union's attorneys' fees to the judgment to the State Court Judgment in the manner provided for by California law.

107. It should be noted that the Credit Union was able to recover and has sold a vehicle which was collateral on one of the loans on which the judgment was based. The Credit Union will be issuing a Notice of Deficiency Balance and filing in the state court a Memorandum of Costs giving credit for the sale of the vehicle, in the manner required by the California Commercial Code after the Credit Union obtains from the bankruptcy court a judgment for non-dischargeability of debt.

I declare under penalty of perjury, under the laws of the United States of America that the foregoing is true and correct.

Executed this 24th day of April, 2017, in the County of Los Angeles, State of California.

DocuSigned by:

RAMIL AGUILAR
74C9CDB89B37443...